Andrea Santarsiere (ISB # 8818)
Center for Biological Diversity
P.O. Box 469
Victor, ID 83455
Ph: (303) 854-7748
Fax: (208) 787-5857
asantarsiere@biologicaldiversity.org

Collette Adkins (MN # 035059X)
Center for Biological Diversity
P.O. Box 595
Circle Pines, MN  55014-0595
Ph: (651) 955-3821
cadkins@biologicaldiversity.org

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
NORTHERN DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, WILDEARTH GUARDIANS, IDAHO CONSERVATION LEAGUE, THE LANDS COUNCIL, and SELKIRK CONSERVATION ALLIANCE,<br><br>      *Plaintiffs*,<br><br>                  v.<br><br>U.S. FOREST SERVICE; VICKI CHRISTIANSEN, in her official capacity as Chief of the U.S. Forest Service; JEANNE HIGGINS, in her official capacity as Forest Supervisor for the Idaho Panhandle National Forests; U.S. CUSTOMS AND BORDER PROTECTION; CHAD WOLF, in his official | Case No.:<br><br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

capacity as Acting Secretary of the U.S.
Department of Homeland Security; and
ROBERT JANSON, in his official capacity as
Acting Assistant Commissioner for U.S.
Customs and Border Protection,

*Defendants.*

## INTRODUCTION

1.      This action seeks declaratory and injunctive relief for violations of law by
Defendants United States Forest Service ("Forest Service") and Customs and Border Protection
("CBP") (collectively, "Defendants") in approving the construction and maintenance of Bog
Creek Road and removing the seasonal restriction on five roads in the Idaho Panhandle National
Forests.  The Idaho Panhandle National Forests, including the project area, contain crucial
habitat for a variety of imperiled wildlife, including grizzly bears, mountain caribou, Canada
lynx, wolverines, and bull trout.

2.      Since 1975, grizzly bears in the Selkirk ecosystem have been listed as a
threatened species under the Endangered Species Act ("ESA"), and in 1999, the U.S. Fish and
Wildlife Service ("FWS") found that this small and isolated population warrants reclassification
to endangered status.  In finding that the Selkirk grizzly bear population warrants listing as an
endangered species, FWS determined that the population is in danger of extinction due to habitat
alteration and potential isolation from bears in Canada.  Habitat fragmentation continues to
threaten grizzly bears in the Selkirk ecosystem, and this population has failed to reach most
recovery targets as laid out in FWS's 1993 Grizzly Bear Recovery Plan.  The Forest Service's
approval of the Bog Creek Road Project ("Project") will exacerbate the hurdles already thwarting
grizzly bear recovery.

3.      Defendants originally proposed the reconstruction and opening of a presently
decommissioned road in the Idaho Panhandle National Forests in the Selkirk Mountains near the
U.S.-Canada border in the Blue-Grass Bear Management Unit ("BMU").  Marked for
reconstruction, Bog Creek Road has been closed and gated at both ends since the late 1980s to

protect grizzly bears and has been impassable to vehicles for nearly two decades. Reopening the road will require the clearing of vegetation as well as extensive construction and maintenance. Additionally, the designation of the 5.6-mile road will be changed from seasonally restricted—which includes a limitation of 57 vehicle trips during the active bear year, April 1 through November 15—to administrative open, allowing unlimited access by the Forest Service, CBP, and other federal and state agencies.

4.      At the same time, Defendants proposed changing the motorized use of the 7.4-mile Blue Joe Creek Road from seasonally restricted with a limitation of 57 vehicle trips per active bear year to administrative open, allowing for unlimited trips by private property owners to the Continental Mine property. As proposed, the Project would directly impact grizzly bears and their habitat by authorizing increased motorized use in an area that the Forest Service has recognized as secure habitat necessary for grizzly bear recovery.

5.      On February 15, 2019, the Forest Service and CBP issued a Final Environmental Impact Statement ("FEIS"), after which Plaintiffs and others submitted objections to the Project, noting that the Project as proposed would violate numerous environmental laws.

6.      Following review of the various objections and reconsultation with the U.S. Fish and Wildlife Service, the agencies issued final Records of Decision ("RODs") authorizing the reconstruction of Bog Creek Road and the change in designation of Blue Joe Creek Road as originally proposed. Additionally, the final RODs approved changes in the designation of three additional roads from seasonally restricted to administrative open, allowing for unlimited trips by private property owners to the Continental Mine property. The designation change for these three roads in addition to the change for Blue Joe Creek Road authorizes increased use on 21.9 miles of Forest Service roads in the project area.

7.      Originally identified as a priority for closure to improve grizzly bear habitat, the Forest Service decided not to close the southern 3.6 miles of Forest Service Road 636. This road will remain open as seasonally restricted. The RODs permit a livestock permittee to travel the road up to six times during the active bear year to place salt blocks for his cattle. However, the FEIS and RODs do not restrict CPB access on Forest Road 636.

COMPLAINT - 3

8. Further increasing motor vehicle use in the Blue-Grass BMU, the RODs also authorize a change in the designation of 4.9 miles of Forest Service Road 1009 from seasonally restricted to open to the public from July 15 to August 15 annually.

9. The RODs have also authorized the closure of several roads in the project area. The majority of these roads have been effectively closed for years because they are overgrown and undrivable; thus, the decision to "close" them amounts to no more than a database change.

10. The increase in road use and human presence from these authorized actions threatens to further fragment grizzly bear habitat and increase the potential for human-caused mortality of bears on this fragile population.

11. In approving the RODs, Defendants violated the National Forest Management Act ("NFMA") by failing to comply with applicable Forest Plan standards necessary to protect and restore the Selkirk grizzly bear population, and violated the National Environmental Policy Act ("NEPA") by failing to take a hard look at the impacts to grizzly bears from the Project.

12. Plaintiffs hereby ask the Court to declare that Defendants violated federal law and issue other injunctive relief to redress the injuries caused by these violations.

**JURISDICTION AND VENUE**

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), § 1346 (United States as a defendant), § 2201 (injunctive relief), and § 2202 (declaratory relief). This case arises under the laws of the United States, including NFMA, NEPA, and the Administrative Procedure Act ("APA"). An actual, justiciable controversy exists between Plaintiffs and Defendants within the meaning of 28 U.S.C. § 2201. This Court has authority to issue the relief requested under the APA, 5 U.S.C. §§ 701-706, and 28 U.S.C. §§ 2201-2202.

14. Venue is proper under this Court pursuant to 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district. The Forest Service official who authorized and approved the Forest Service's decision is headquartered in Coeur d'Alene, which is located within this district. Additionally, Plaintiffs Center for Biological Diversity, Idaho Conservation League, Selkirk Conservation

COMPLAINT - 4

Alliance, and WildEarth Guardians have offices within this district.

15.     This case is properly filed in the Northern Division of the District of Idaho pursuant to Local Rule 3.1 because the Bog Creek Road project area is in Boundary County, Idaho.

## PARTIES

16.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a nonprofit organization dedicated to the preservation and restoration of biodiversity, native species, and ecosystems.  Based in Tucson, Arizona with offices throughout the country, including in Idaho, the Center works through science, law, and creative media to secure a future for all species, great or small, hovering on the brink of extinction.  The Center has more than 1.6 million supporters, including more than 74,000 members, with 434 members residing in Idaho. The Center and its members have a long-standing interest in conserving native species in the American West and routinely advocate for native species conservation and protection, including advocating for the conservation and protection of grizzly bears for more than 15 years.

17.     Plaintiff WILDEARTH GUARDIANS ("Guardians") is a nonprofit conservation organization with offices in Idaho and six other states, and has more than 278,000 members and supporters across the United States and the world.  Guardians' mission is to protect and restore wildlife, wild places, wild rivers, and the health of the American West.  Guardians has organizational interests in the proper and lawful management of the forest road system and motorized trail system and the associated impacts on the forest's wildlife and wild places. Guardians also has an organizational interest in ensuring the Forest Service complies with all environmental laws, in particular the National Environmental Policy Act and the National Forest Management Act.

18.     Plaintiff IDAHO CONSERVATON LEAGUE ("ICL") is a nonprofit organization that has served as Idaho's leading voice for conservation since 1973.  ICL works to protect Idaho's environment through public education, outreach, advocacy, and policy development.  As Idaho's largest state-based conservation organization, ICL represents over 25,000 supporters and

10,000 members, many of whom have a deep personal interest in protecting human health and the environment.  ICL has advocated for the recovery of Idaho's threatened and endangered species, including grizzly bears, since the organization's inception.

19.     Plaintiff THE LANDS COUNCIL is a Washington nonprofit organization dedicated to protecting and conserving the natural resources and quality of life of the Inland Pacific Northwest.  With approximately 3,000 supporters, including 1,200 members, The Lands Council's principal office is located in Spokane, Washington.  As an organization and on behalf of its staff and members, The Lands Council has been extensively involved in seeking to promote sound land management practices, including protection and recovery of grizzly bear habitat and intact forest ecosystems on federal lands.

20.     Plaintiff SELKIRK CONSERVATION ALLIANCE ("SCA") is an Idaho nonprofit organization headquartered in Priest River with more than 130 members.  For more than 30 years, SCA has advocated for environmental issues in the Southern Selkirk Mountain ecosystem.  On behalf of its members and supporters, SCA has been actively involved with protection of the endangered woodland caribou and the imperiled grizzly bear population.

21.     Plaintiffs, both organizationally and on behalf of their staff, members, and supporters, have deep and long-standing interests in the preservation and recovery of imperiled species, including grizzly bears, Canada lynx, wolverines, and bull trout.  To further these goals, Plaintiffs have participated in various agency proceedings and public comment opportunities to protect and recover these species, including FWS listing and delisting proposals and Forest Service projects that may negatively impact these species.  Plaintiffs' interests in protecting and recovering these species are directly harmed by the Defendants' approval of the Bog Creek Road Project without analysis of the direct, indirect, and cumulative impacts of the Project and without compliance with the Idaho Panhandle National Forests Plan.

22.     Plaintiffs' staff, members, and supporters live near and regularly visit areas in and around the project area, often using these areas for various recreational pursuits, including to observe and photograph native wildlife in their natural habitat.  Plaintiffs' staff, members, and supporters have professional, spiritual, aesthetic, and recreational interests in wildlife that may

COMPLAINT - 6

be impacted by the Project. Plaintiffs' staff, members, and supporters have visited and plan to continue to travel to and recreate in these areas, and they will maintain an interest in preserving wildlife and wildlife habitat in the project area in the future.

23. Plaintiffs' staff, members, and supporters' professional, spiritual, aesthetic, and recreational interests and enjoyment have been and will continue to be greatly diminished by the approval of the Bog Creek Road Project because the Project will thwart grizzly bear recovery in the Selkirk Recovery Zone and will decrease Plaintiffs' opportunities to see grizzly bears in and around the project area.

24. Plaintiffs also have an interest in the effective implementation of environmental laws aimed at protecting wildlife and wildlife habitat, including NEPA and NFMA. They are injured by Defendants' failure to analyze the direct, indirect, and cumulative impacts of the Project on grizzly bear habitat and grizzly bear survival and recovery, as NEPA requires, and to ensure compliance with the Idaho Panhandle National Forests Plan, as NFMA requires.

25. Defendants' approval of the Bog Creek Road Project without complying with mandatory duties under NFMA, NEPA, and the APA have harmed and will continue to harm Plaintiffs' interests. The injuries described above are actual, concrete injuries presently suffered by Plaintiffs' staff, members, and supporters, and they will continue to occur unless this Court grants relief. These injuries are directly caused by Defendants' actions and inactions, and the relief sought herein would redress those injuries. Plaintiffs have no other adequate remedy at law.

26. Defendant UNITED STATES FOREST SERVICE is an agency of the United States and a division of the United States Department of Agriculture. The Forest Service is responsible for managing the lands and resources within the Idaho Panhandle National Forests in accordance and compliance with NFMA, NEPA, and other federal laws and regulations.

27. Defendant VICKI CHRISTIANSEN is the Chief of the United States Forest Service. She has final responsibility for making decisions required by and in accordance with NFMA and other federal laws and regulations. Vicki Christiansen is sued in her official capacity.

28.     Defendant JEANNE HIGGINS is the Forest Supervisor for the Idaho Panhandle National Forests and signed the Forest Service's Record of Decision authorizing this Project. Jeanne Higgins is sued in her official capacity.

29.     Defendant U.S. CUSTOMS AND BORDER PROTECTION is an agency within the U.S. Department of Homeland Security.  CBP must ensure border security along the U.S.-Canada border consistent with applicable legal requirements, including NFMA, NEPA, and other federal laws and regulations.

30.     Defendant CHAD WOLF is the Acting Secretary of U.S. Department of Homeland Security.  He must ensure that decisions made by the Department of Homeland Security comply with federal law.  Chad Wolf is sued in his official capacity.

31.     Defendant ROBERT JANSON is the Acting Assistant Commissioner for U.S. Customs and Border Protection and signed the Customs and Border Protection's Record of Decision authorizing this Project.  Robert Janson is sued in his official capacity.

## LEGAL BACKGROUND

### I.  The National Forest Management Act

32.     Through NFMA, Congress established a two-step process for managing National Forests.  First, NFMA directs the Forest Service to prepare and implement comprehensive Land Resource Management Plans (commonly called Forest Plans) for each national forest.  16 U.S.C. § 1604(a).  Each Forest Plan (including any associated amendments) establishes management direction for resources, uses, and protective measures through standards, guidelines, goals, and objectives for that Forest.  Second, the Forest Service must ensure that all site-specific projects within each Forest, including but not limited to logging, mining, road construction, and motorized use, are consistent with the relevant forest plan.  *Id.* § 1604(i).

33.     The Idaho Panhandle National Forests' current Forest Plan was approved in 2015. The Plan includes standards and guidelines to protect grizzly bears.

34.     In November 2011, the Forest Service adopted the Forest Plan Amendments for Motorized Access Management within the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones ("Access Amendment"), to be incorporated into forest plans for the Kootenai, Lolo, and

Idaho Panhandle National Forests. The Access Amendment sets standards that apply to all future site-specific decisions regarding access management, including road construction, reconstruction, and decommissioning projects, in the Selkirk and Cabinet-Yaak grizzly bear recovery zones within the Kootenai, Lolo, and Idaho Panhandle National Forests.

35.     The Forest Plan for the Idaho Panhandle National Forests incorporates the Access Amendment as a non-discretionary Forest Plan "standard." United States Department of Agriculture, Forest Service, Northern Region, Land Management Plan, Idaho Panhandle National Forests (2015 Revision) (hereinafter, "Forest Plan"), at 5. As defined in the Forest Plan, a standard is a "[l]imitation or requirement that is applied to project and activity decision making to help achieve goals and objectives." *Id.* at 2.

36.     The Access Amendment adopted different parameters for each Bear Management Unit within the Kootenai, Lolo, and Idaho Panhandle National Forests. BMUs generally approximate the size of a female grizzly bear's home range and include all habitat components necessary for grizzly bear survival and reproduction. *Id.* at 110. Grizzly bears that inhabit BMUs are considered critical to the recovery of the species. U.S. Fish & Wildlife Service, Biological Opinion for the Bog Creek Road Project (Dec. 27, 2019) (hereinafter, "BiOp"), at 17.

37.     Relevant to this Project, the Access Amendment requires that the Forest Service ensure the following parameters are met for the Blue-Grass BMU: (1) Open Motorized Route Density of greater than one mile per square mile on no more than 33 percent of the BMU (33 percent maximum); (2) Total Motorized Route Density of greater than two miles per square mile on no more than 26 percent of the BMU (26 percent maximum); and (3) core area of at least 55 percent of the BMU (55 percent minimum). Forest Plan, App. B at 152, Table 25. As noted in the Forest Plan, "core areas do not include any gated roads but may contain roads that are impassible due to vegetation or constructed barriers. Core areas strive to contain the full range of season habitats that are available in the BMU." *Id.* at 114.

38.     Pursuant to the Forest Plan's Access Amendment, "[o]nce route closures to create core areas are established and effective, these core areas should remain in place for at least 10 years." *Id.* at 152. The Forest Service must ensure that projects that would reduce core area

within individual BMUs shall not reduce the percent core area below the minimum standards for the affected BMU "without compensating with in-kind replacement concurrently or prior to incurring the losses." *Id.* at 153.

## II. The National Environmental Policy Act

39.     NEPA, 42 U.S.C. §§ 4321 *et seq.*, is the "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). The Council on Environmental Quality ("CEQ") has adopted regulations governing the implementation of NEPA. Individual agencies have also promulgated regulations and guidance further interpreting their NEPA obligations. *See* 36 C.F.R. § 220 (Forest Service NEPA regulations).

40.     Agencies shall initiate the NEPA process at the "earliest possible time" so that actions and decisions reflect environmental values. 40 C.F.R. § 1501.2. An agency must comply with NEPA prior to making any commitment of resources that would have an adverse environmental impact or prejudice or limit the choice of reasonable alternatives. *Id.* §§ 1502.2(f), 1506.1(a). This ensures that an agency will not act on incomplete information only to regret its decision after it is too late to correct. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

41.     In passing NEPA, Congress declared "a broad national commitment to protecting and promoting environmental quality." *Id.* at 348; 42 U.S.C. § 4331. To ensure this commitment is realized, NEPA's twin objectives requires that agencies (1) take a "hard look" at every significant aspect of the environmental impact of a proposed action, and (2) guarantee that relevant information is available to the public to promote well-informed public participation. *Robertson,* 490 U.S. at 350.

42.     Under NEPA, federal agencies must prepare a detailed Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). First, NEPA requires an early process, called scoping, in which the agency determines the scope of issues to be addressed and the significant issues requiring detailed analysis. 40 C.F.R. § 1501.7. If the agency identifies significant impacts through scoping, NEPA mandates that agencies must prepare an EIS through a two-stage

process, first preparing and soliciting public comment on a draft EIS that fully complies with NEPA's environmental analysis requirements. *See id.* §§ 1502.9(a), 1503.1(a)(4). Agencies next prepare a final EIS that responds to the comments received by the agency regarding the draft EIS. *Id.* §§ 1502.9(b), 1503.4.

43. In an EIS, agencies must fully analyze all direct, indirect and cumulative effects of a project. *Id.* § 1502.16. Direct effects include those "which are caused by the action and occur at the same time and place." *Id.* § 1508.8(a). Indirect effects include those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use; population density or growth rate; and related effects on air and water on other natural systems, including ecosystems." *Id.* § 1508.8(b). Finally, cumulative impacts include those "which result from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* § 1508.7.

44. NEPA requires that agencies use information "of high quality" and "insure the professional integrity, including scientific integrity," of their discussions and analyses. *Id.* §§ 1500.1(b), 1502.24. Additionally, agencies "shall identify any methodologies used" and "scientific and other sources relied upon" for their conclusions. *Id.* § 1502.24. "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.* § 1500.1(b).

## III. The Administrative Procedure Act

45. The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial relief thereof." 5 U.S.C. § 702.

46. Upon review of agency action, the court shall "hold unlawful and set aside actions

. . . found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law." *Id.* § 706(2). An action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## PROCEDURAL BACKGROUND

47.     CBP began scoping for this Project in February 2013. Based upon information received during the initial scoping period, CBP and the Forest Service determined that it was necessary to prepare an Environmental Impact Statement for the Project in accordance with NEPA.

48.     The agencies submitted a Notice of Intent ("NOI") to prepare an EIS to the Federal Register, which was published on April 27, 2016. The NOI opened a 30-day public comment period. The NOI stated that the agencies were preparing an EIS to assess the environmental impacts of repairing a 5.6-mile section of Bog Creek Road and closing additional roads for motorized use in order to reduce road density within the Blue-Grass BMU to comply with the Access Amendment. All Plaintiffs submitted timely comments on the proposal.

49.     On June 1, 2018, the agencies published in the Federal Register a Notice of Availability of a Draft EIS, which opened a comment period ending July 16, 2018. The Draft EIS analyzed four alternatives, including a no action alternative. As described in the NOI, the Proposed Action—Alternative 2—included repairing, maintaining, and changing the designated use on Bog Creek Road from seasonally restricted to administrative open, and closing to motorized use additional roads in the Blue-Grass BMU. The Proposed Action also added another component that would change the motorized use of the 7.4-mile Blue Joe Creek Road from seasonally restricted, with limitations to 57 vehicle round trips per active bear year, to administrative open, which would allow for unlimited trips by private property owners to the Continental Mine property. Plaintiffs submitted timely comments on the DEIS.

50.     On February 15, 2019, the agencies issued the Final EIS and Draft Records of Decision ("ROD") by USFS and CBP.  The FEIS added an additional action alternative for analysis.  The agencies chose Alternative 3, called the Modified Proposed Action, as the Preferred Alternative.  Alternative 3 essentially mirrored that of the Proposed Action in the Draft EIS, but proposed closing to motorized use a different set of seasonally restricted Forest Service roads in the Blue-Grass BMU.  The repair and maintenance activities for Bog Creek Road, and the changes to administrative open for both Bog Creek Road and Blue Joe Creek Road, remained the same.  Pursuant to Forest Service regulations, the publication of the Final EIS and Draft RODs initiated an objection period, which ended on April 2, 2019.  Plaintiffs submitted timely objections to the Project.

51.     The Forest Service subsequently sent letters to those who submitted objections noting that pursuant to Forest Service regulations, the agency would provide a written response or a written notification of an extension of the review period by May 16, 2019.

52.     On May 13, 2019, the Forest Service sent letters stating it had decided to exercise its discretion under the regulations to extend the time for the objection review until June 15, 2019.  The same letter announced five objection resolution meetings.  The first meeting was to be with Chuck Roady (of Continental Lands Incorporated representing those with inholdings around the Continental Mine Site), the second with Boundary County, the third with Bonner County, the fourth with Mike Ripatti (a livestock owner who grazes cattle in the area), and the fifth for "[o]ther objectors."  Plaintiffs fell into the category for the fifth meeting.

53.     On June 4, 2019, several Plaintiffs participated in the resolution meeting with the Forest Service and CBP.  During the meeting, Plaintiffs expressed concerns about the impacts of the Project on grizzly bears and whether the Project would violate environmental laws and regulations.  Additionally, the agencies informed participants during the meeting that they would be submitting a new Biological Assessment to the U.S. Fish and Wildlife Service, noting FWS wished to focus on three aspects of the Project:  inholding access, the grazing allotments in Grass Creek, and increasing motorized access along Forest Service Road 1009 for one month in the summer.  Following submission of a new Biological Assessment to address these aspects of the

COMPLAINT - 13

process, FWS would issue a Biological Opinion in accordance with the Endangered Species Act. The Forest Service issued its new Biological Assessment dated July 1, 2019. SWCA Environmental Consultants and Idaho Panhandle National Forests, Bog Creek Road Project Biological Assessment (July 1, 2019) (hereinafter, "BA").

54.     In January 2020, FWS released its final Biological Opinion, dated December 27, 2019. The Forest Service reached out to Plaintiffs, informing them that they were getting close to releasing a final decision and to offer an update prior to the release. The agency scheduled a call for January 31, 2020 to discuss the decisions.

55.     Soon thereafter, and before the scheduled call with Plaintiffs, the Forest Service signed its final ROD dated January 28, 2020, and CBP signed its final ROD dated January 31, 2020. The CBP ROD approves funding for implementing the reconstruction and maintenance of Bog Creek Road, while the Forest Service ROD approves the reconstruction and maintenance of Bog Creek Road, implementation of changes in the seasonally restricted designation of roads in the Blue-Grass BMU, and decommissioning and closure of other motorized roads in the BMU.

56.     During the call with the agencies on January 31, 2020, the agencies explained that after the objection process, the Forest Service reconsulted with FWS. The resulting Biological Opinion and the final RODs contain the three components included in the FEIS's Preferred Alternative, namely the reconstruction of Bog Creek Road, the change in designation from seasonally restricted to administrative open for Bog Creek Road and Blue Joe Creek Road, and closing other roads to motorized use. However, the final RODs also contain additional elements not analyzed in the FEIS's Preferred Alternative.

57.     First, they include a change in designation from seasonally restricted to open on three additional Forest Service Roads (portions of FSRs 1009, 636, and 1011), resulting in a designation change on an additional 14.5 miles that were not considered in the Preferred Alternative. The Forest Service states these changes were made to give those who own private property near Continental Mine unlimited access to their property from the east, and that private property owners will need a special use permit for Continental Lands private property access. Landowners will receive unlimited access but the permit will require that access and egress is

direct and will not allow for use of the public lands along the road corridor.

58.     Second, the southern 3.6 miles of FSR 636 will remain as seasonally restricted but will allow for the livestock permittee to use the road six times per year to access salt blocks placed along the road.

59.     Third, although FSR 1388 will be closed to motorized use as contemplated in the Preferred Alternative, it will now remain open to snowmobile use.

60.     Finally, 4.9 miles of FSR 1009 will change in designation from seasonally restricted with vehicle trip limitations to open to the public from July 15 to August 15 annually.

61.     None of the changes made to the Project addressed any of the concerns Plaintiffs had expressed during the objection process.  During Plaintiffs' call with the agencies on January 31, 2020, Plaintiffs again expressed concerns with the Project's impacts on grizzly bears and the legal violations alleged herein.

## FACTUAL BACKGROUND

### I.  Grizzly Bears in the Selkirk Recovery Zone

62.     Grizzly bears once ranged throughout most of western North American, from the high Arctic to the Sierra Madre Occidental of Mexico, and from the coast of California across most of the Great Plains.  Scientists believe that prior to European settlement, approximately 50,000 grizzly bears occupied the western United States between Canada and Mexico.  With European settlement of the American West and a federally funded bounty program aimed at eradication, grizzly bears were shot, trapped, and poisoned, reducing the population to just two percent of their historic range.

63.     Because of its precipitous decline, FWS listed the grizzly bear as a threatened species in the lower 48 states under the ESA in 1975.  Today scientists estimate there are less than 2,000 grizzly bears left in the lower 48 states, occupying five isolated populations.

64.     The ESA requires FWS to develop and implement recovery plans "for the conservation and survival or endangered and threatened species."  16 U.S.C. § 1533(f)(1).  FWS issued the first Grizzly Bear Recovery Plan in 1982, and revised it in 1993.  The agency identified six recovery zones in the 1993 Grizzly Bear Recovery Plan, including the Selkirk

Recovery Zone ("SRZ"). To achieve the goals of the 1993 Grizzly Bear Recovery Plan, the species must be recovered within each identified recovery zone. The SRZ is one of the six designated recovery zones.

65. The SRZ consists of approximately 2,000 square miles, starting at the southern tip to the Selkirk Mountain Range and extending into Canada. The SRZ is the only recovery zone which includes lands in Canada, but the U.S. Fish and Wildlife Service determined such a delineation was necessary because the available habitat in the U.S. was insufficient to support a viable grizzly bear population. The U.S. portion of the SRZ lies in the Idaho Panhandle National Forests.

66. Grizzly bears in the SRZ have the lowest genetic diversity of all grizzly bear populations in the lower 48 states, creating the need to facilitate open movement and connectivity with other bear populations. Grizzly bear persistence in the U.S. portion of the SRZ depends on connectivity to Canada. Thus, connectivity in the SRZ between bears in the U.S. and bears in British Columbia is considered critical to recovery for this bear population.

67. Functional connectivity leading to recovery requires female immigration that results in successful reproduction. There is some evidence that females may be moving between the South Purcells and the Selkirks but no evidence of post-movement breeding.

68. Bears generally avoid roads and research demonstrates that most human-caused grizzly bear mortalities occur on or near roads. Thus, the reduction of roads and motorized use is of particular concern for the survival and recovery of grizzly bears. Habitat fragmentation, largely as a result of roads, is one of the biggest issues facing grizzly bears in the SRZ.

69. Although grizzly bears in the SRZ remain listed as a threatened species under the ESA, in 1999 FWS determined that reclassification to an endangered species is warranted but precluded by work on higher-priority species. FWS asserted that this determination is based on evidence that the population is in danger of extinction due to habitat alteration and potential isolation from grizzly bears in Canada.

70. The most recent population estimate for the SRZ is 83 bears, below the minimum population goal of 90 set forth in the 1993 Grizzly Bear Recovery Plan. Only approximately 48

COMPLAINT - 16

grizzly bears reside in the U.S. portion. This small population size is a significant threat to grizzly bears in the SRZ, exacerbated by continued low genetic diversity and habitat fragmentation.

71.     The Recovery Plan specifically sets forth several sub-goals for grizzly bear recovery in the SRZ: (a) six females with cubs over a running six-year average both inside the Recovery Zone and within a ten mile area immediately surrounding it; (b) seven of the ten BMUs in the U.S. are occupied by females with young from a running six-year sum of observations; (c) known, human-caused mortality not to exceed four percent of the population estimate based on the most recent three-year sum of females with cubs; and (d) no more than 30 percent of this four percent mortality limit shall be females. To achieve recovery in this Zone, these mortality limits cannot be exceeded during any two consecutive years. According to the FEIS, recovery targets have been reached for the distribution of females with young in seven of ten BMUs in the most recent six years, and for the four percent limit on human-caused mortality. The other two recovery targets have not been met for grizzly bears in the SRZ.

72.     The Bog Creek FEIS identifies meeting the Grizzly Bear Recovery Plan goals as a specific purpose and need for the Project. The FEIS, however, presents only a brief table (Table 3.2.4) listing the Recovery Plan's goals and stating whether they have or have not been met to date.

73.     Defendants offer no discussion or analysis in the FEIS as to how the Bog Creek Road Project will impact achievement of these goals. For example, the FEIS fails to analyze the Project's impacts on female bears, even though the Recovery Plan set specific limits on female mortality as a necessary target to achieve recovery. Additionally, while the FEIS admits that the Project could lead to increased mortality, the FEIS never analyzes whether it believes an increase in human-caused mortality could reach the limits set in the Recovery Plan.

**II.  The Forest Plan for the Idaho Panhandle National Forests and the Access Amendment**

74.     The Idaho Panhandle National Forests encompass approximately 2.5 million acres of public lands in the panhandle of north Idaho, with small areas extending into eastern Washington and western Montana.

COMPLAINT - 17

75.     The Forests are made up of several mountain ranges, including the Selkirk Mountains, Cabinet Mountains, Purcell Mountains, Coeur d'Alene Range, and Bitterroot Range. Many large lakes and long river valleys also traverse the Forests' rugged terrain.

76.     The numerous mountains and high-quality water sources provide ideal habitat conditions for myriad wildlife, including threatened, endangered and sensitive species, such as the grizzly bear, Canada lynx, woodland caribou, wolverines, bull trout, and various bird species. The Forest especially provides prime habitat for grizzly bears.

77.     The FWS's 1993 Grizzly Bear Recovery Plan found that existing forest plans did not contain sufficient direction for the management of motorized use to protect grizzly bears, and recommended that the Interagency Grizzly Bear Committee ("IGBC")—a committee made up of federal, state, and tribal representatives—appoint a task force of biologists to develop motorized access standards to be implemented in the Selkirk and Cabinet-Yaak Grizzly Bear Recovery Zones. In response, the IGBC Selkirk/Cabinet-Yaak Subcommittee created an Access Management Task Force to develop parameters for road densities in the Selkirk and Cabinet-Yaak Recovery Zones using the best available science, public input, and social impacts.

78.     Recognizing that "[c]ontrolling and directing motorized access is one of the most important tools in achieving habitat effectiveness and managing grizzly bear recovery," the task force developed recommendations to facilitate grizzly bear recovery by minimizing human-grizzly bear interactions and reducing the displacement of grizzly bears from important habitats. In 1998, the Task Force presented its recommended road density standards for implementation in grizzly bear habitat to the Subcommittee. The Forest Service did not adopt the recommendations across the board, but instead chose to assign its own set of standards to each BMU based on biological and non-biological factors. These standards eventually formed the Access Amendment for the Kootenai, Lolo, and Idaho Panhandle National Forests.

79.      In November 2011, the Forest Service issued a Record of Decision ("ROD") finalizing adoption of the Access Amendment, which has been incorporated as a "standard" in the Idaho Panhandle revised Forest Plan. As such, compliance with the Access Amendment is mandatory and any site-specific projects must be designed in exact accordance with it.

COMPLAINT - 18

80.     The Bog Creek Road Project area is located in the Idaho Panhandle National Forests near Continental Mountain.  The project area spans the Bonners Ferry and Priest Lake Ranger Districts just south of the U.S.-Canada border.  The area is within the Selkirk Recovery Zone's Blue-Grass BMU and is comprised of 96 percent Forest Service-managed land.  A smaller portion of the Project also extends into the Sullivan-Hughes BMU.

81.     The Blue-Grass BMU contains high quality forage and denning habitat.  It is considered one of the most important BMUs in the entire SRZ because scientists have consistently documented more females with cubs in this BMU than in other BMUs in the U.S. portion of the Zone.  Relatedly, the Blue-Grass BMU has one of the highest rates of denning by radio-collared grizzly bears.  Of the 38 known den sites in the U.S. portion of the SRZ, 17 (44.7 percent) have occurred in the Blue-Grass BMU, including seven males and ten females.  The highest quality habitat for grizzly bears in this BMU is located in the western portion, where the Bog Creek Project has been authorized.

82.     Moreover, this BMU is only one of two BMUs in the SRZ that contains important connectivity corridor for grizzly bear movement between the U.S. and British Columbia.  For these reasons, the Forest Plan designates the Blue-Grass BMU as Priority Level 1, meaning grizzly bear recovery is a top priority.

83.     Similarly, National Forest Lands within identified recovery zones are delineated into five "Management Situations" to direct agency management based upon the relative importance of the area to grizzly bear recovery.  The Blue-Grass BMU is identified as Management Situation 1 ("MS1") because it contains grizzly population centers and habitat necessary for grizzly bear survival and recovery.  In MS1 areas, management priorities include grizzly habitat maintenance and improvement, as well as minimizing grizzly-human conflicts. Management decisions must favor the needs of grizzly bears when grizzly habitat and other use values compete.  Land uses incompatible with grizzly bear needs, such as roads and motorized use, are not permitted.

84.     The Forest Plan's Access Amendment requires that the Blue-Grass BMU meet the same parameters as those originally recommended by the Access Management Task Force—

Open Motorized Route Density of greater than one mile per square mile on no more than 33 percent of the BMU (33 percent maximum); Total Motorized Route Density of greater than two miles per square mile on no more than 26 percent of the BMU (26 percent maximum); and core area of at least 55 percent of the BMU (55 percent minimum). These strict Access Amendment parameters were chosen because of the importance of the Blue-Grass BMU to overall recovery of grizzly bears in the SRZ.

85.     The Access Amendment also requires the Forest Service to ensure that projects that would reduce core area within individual BMUs shall not reduce the percent core area below the minimum standards for the affected BMU without compensating with in-kind replacement concurrently or prior to incurring the losses.

86.     The Blue-Grass BMU does not currently meet the standards for Total Motorized Route Density or core area habitat. For example, Table 1.2.1 of the FEIS shows that as of 2017, the Total Motorized Route Density is at 29 percent (3 percent higher than the 26 percent maximum) and existing core area for grizzlies is 48 percent (7 percent lower than the 55 percent minimum).

## III.  The Forest Service's Authorization of the Bog Creek Road Project

87.     In the Final ROD, the Forest Service authorized the Bog Creek Road Project consisting of six components: (1) road reconstruction and maintenance of Bog Creek Road and change in motorized use designation from seasonally restricted (administrative motorized use permitted between April 1 and November 15 only and motorized vehicle trips limited to 57 round trips per active bear year) to administrative open (open year-round for administrative motorized use); (2) change in motorized use designation of 21.9 mile of Forest Service Roads, including portions of FSRs 636, 1009, 1101, and 2546 (Blue Joe Creek Road), from seasonally restricted to administrative open to give Continental Mine private landowners unlimited access from the east; (3) closure of selected seasonally restricted Forest Service roads to motorized use; (4) maintenance of the seasonally restricted designation on the southern 3.6 miles of FSR 636 while allowing the livestock permittee six trips annually between April and November to access salting locations along the road; (5) closure of FSR 1388 to motorized use while maintaining the

road as a snowmobile route; and (6) change in designation of 4.9 miles of FSR 1009 from seasonally restricted to open to the public from July 15 to August 15 annually.

88.     Under the first component of the Project, Defendants will reconstruct, maintain, and change the motorized designation of 5.6 miles of Bog Creek Road, which lies just south of the U.S.-Canada border, running east to west around the Continental Mountain.

89.     Bog Creek Road runs east to west through the Blue-Grass BMU, just south of the Canadian border.  It was originally constructed primarily as a logging road sometime between 1934 and 1956 but was gated on both ends in the late 1980s to create secure habitat for grizzly bears.  The road experienced minor failures in the mid-1990s, with a large failure around 2000-2001, when a large culvert failed due to heavy surface runoff.  After the large culvert failure, the road became completely impassable.

90.     Because of the impassability of Bog Creek Road, it has become heavily vegetated with alder brush, small trees, and other vegetation.  Currently, Bog Creek Road is gated at the east end and barricaded at the west end.  In recent years the road has been used infrequently by CBP personnel travelling on all-terrain vehicles and on horseback, but using ATVs requires a winch system to traverse the large culvert.

91.     While examining the need to meet the Access Amendment standards, the Forest Service identified the long-term closure of Bog Creek Road as an option to increase core grizzly habitat in the Blue-Grass BMU.  Consistent with that plan, the Forest Service stopped maintaining Bog Creek Road.  Although the Bog Creek Road area is not currently categorized as core habitat, it has been functioning as core habitat for years.

92.     In 2016, without conducting any environmental analysis under NEPA and without consulting with FWS, CBP conducted vegetation-clearing activities on the eastern portion of the Bog Creek Road corridor.  CBP has not taken any steps to reclaim or restore the cleared area.

93.     Defendants allege opening the road will help CBP protect the U.S. northern border.  CBP can access the northern border without using Bog Creek Road via state highways in Washington and Idaho and other forest roads.

94.     Under the Forest Service decision challenged here, reconstruction and

maintenance of Bog Creek Road will include grading and resurfacing, filling potholes, removing boulders, installing and replacing numerous culverts, cut and fill work, and the removal of trees and other vegetation within and alongside the roadway. This work will require the use of dozers, graders, hydraulic excavators, dump trucks, pickup trucks, and sport-utility vehicles. Construction would occur between July 16 and November 15 and could take up to three seasons. According to the FEIS, short-term effects from road reconstruction may last up to ten years following the three-year construction period, totaling up to 13 years of negative impacts to grizzly bears and other wildlife just from the reconstruction.

95.     The U.S. Fish and Wildlife reports that during reconstruction of Bog Creek Road, for up to three years, the additional loss of functional core habitat may negatively impact female grizzly bears. The agency also predicts that potentially long-term adverse effects to adult females may include impacts to feeding, breeding, and sheltering, which may in turn impair reproductive capacity and reduce cub survival. The number of female grizzly bears that may be impacted depends on the number of female grizzlies that reside in the action area, but as the Fish and Wildlife Service notes, the Forest Service has not provided that information.

96.     During the 13-year projected impact period and beyond, grizzly bears will likely be displaced from this area. Displacement is especially impactful to female grizzly bears. As they disperse to avoid humans, females may experience increased stress or decreased nutritional status, leading to a decrease in reproductive fitness and success. Displaced females with cubs risk increased encounters with infanticidal males and decreased cub health and survival as frequent movement inhibits the energy needed for growth and development. These impacts must be thoroughly analyzed because female survival has the greatest impact on population trend and thus negative impacts to females can have long-term consequences to this grizzly bear population.

97.     Long term, Bog Creek Road will create a "semipermeable barrier," inhibiting movement of grizzly bears in the Selkirk Recovery Zone, thereby thwarting genetic exchange and recovery.

98.     Even though Bog Creek Road has been impassible for nearly two decades, the

Forest Service never changed its seasonally restricted designation. Seasonally restricted roads are only open from April 1 to November 15 to minimize impacts to grizzly bears and other forest resources from human presence. This seasonal restriction also limits motorized use to a maximum of 57 trips annually.

99. After completing the reconstruction and repair work, Bog Creek Road will no longer have any seasonal restrictions or trip limits, and instead will be open year-round for administrative motorized use. While Bog Creek Road will not be open to the public, it will be open for use by CBP, the Forest Service, and other state and federal agencies.

100. Although snowmobile use on Bog Creek Road will be prohibited, law enforcement members are currently exempt from the snowmobile closure. Motorized winter recreation can disturb bears in their dens, causing bears to leave the den site early, before they are physically fit to do so. This disturbance becomes even more troublesome for females with cubs, who tend to remain close to their den sites in the spring. If a sow with cubs leave a den site early, the fitness and safety of the female and her cubs may be impaired.

101. In addition, the Forest Service has authorized removing the seasonal use restrictions and trip limits for 21.9 miles on portions of four other Forest Service Roads: FSRs 636, 1009, 1101, and 2546 (Blue Joe Creek Road). These designation changes will allow for unlimited private property access to the Continental Mine lands. The changes will also make these roads open for administrative use by federal and state agencies. Increasing access to the Continental Lands will increase human presence, thereby increasing the disturbance, displacement, and mortality risk to grizzly bears.

102. The Forest Service states that private property owners of Continental Lands will be required to obtain a special use permit to access their property. The permit will allow for unlimited motorized trips but will require that access and egress to the private property is direct and will not allow for use of public lands along the road corridor at any time. However, the FEIS acknowledges rampant, illegal overuse on these roads, demonstrating low compliance with seasonal use restrictions.

103. As part of the Project, the Forest Service has also decided to open FSR 1009 to

the public from July 15 to August 15 annually. Lifting the seasonal restrictions on this road for a month in the middle of the summer, when grizzly bears are rearing young and foraging for food, increases the likelihood of displacement and human-caused mortality along this road corridor.

104.     The southern 3.6 miles of FSR 636 will also permit six trips annually by the current grazing permittee, where he maintains salt blocks for livestock. The FEIS and RODs do not indicate that any trip limitations will be imposed on CBP's use of this road.

105.     The Bog Creek Road Project includes the formal closure of 26.2 miles of Forest Service roads within the Blue-Grass BMU. All roads chosen for closure are currently designated as seasonally restricted and only allow limited motorized administrative use. Most of the roads chosen for closure are already heavily brushed in and are currently undrivable. As the FEIS reveals, these impassable roads, though "not formally closed, . . . are overgrown with trees or brush, or gated, and so do not allow for motorized travel . . . [and] are functioning as grizzly bear core habitat because of their current undrivable status."

106.     The means for closure will vary by site and may include decommissioning (permanent removal of a road from the Forest Service transportation system) or long-term storage (roads remain on the system but are undrivable). Roads placed under long-term storage would remain available if needed for emergency purposes. For roads that are currently impassible, the roads may just be changed administratively and left as is, or a barricade may be placed at the front end. Road closure activities would take place between June 16 and November 15 and could last up to three seasons.

107.     The Biological Assessment indicates the approximate timing for road reconstruction and decommissioning activities. BA at 11, Table 3.3. The reconstruction of Bog Creek Road will take place in Year 1 or 2. Also, in Year 1 or 2, the Forest Service will decommission six roads (FSRs 1388, 1013D, 1013C, 1388A, 1322A 1322), but only one of those roads, 1388, is currently drivable. And in Years 1, 2 or 3, the Forest Service will decommission portions of FSRs 2464 and 2253, both of which have been drivable within the past 10 years but may be currently impassable.

108.     The Forest Service further specifies that the motorized closure of FSR 1388 (Lime

Creek Road) would run concurrently with Bog Creek Road repair which would "partially" compensate for the loss of functional core with the opening of the Bog Creek Road area. Formal decommissioning of currently undrivable roads may not occur until after the repair of Bog Creek Road.

109.     In the Biological Opinion, FWS noted that the Bog Creek Road repair would reduce functional core habitat by 3.2 percent (1,818 acres), relying on the BA. The closure of FSR 1388 will provide an offset for 2 percent of the lost functional core habitat, resulting in a 1.2 percent net loss of functioning core habitat prior to the remaining road closures. Thus, as FWS notes, "the offset of closing FSR 1388 contemporaneously will not be comparable to the Bog Creek Road habitat loss." BiOp at 49. In other words, "[b]ecause the offset from the closure of FSR 1388 will not increase Core habitat availability to the same or greater extent than Core habitat associated with the Bog Creek Road repair, the proposed project will not fully replace the amount of Core habitat lost 'prior to or concurrent' with the loss," as required by the Access Amendment. *Id.* at 48.

110.     Similarly, FWS notes that "the proposed action does not fully offset the habitat loss of Bog Creek Road prior to or concurrent with road repair. Offsetting Core habitat losses prior to or concurrent with an action that reduces Core habitat is required by the Access Amendment. For this reason, we anticipate that the short-term adverse effects to female grizzly bears have not been minimized to the extent practical." BiOp at 54.

111.     This additional uncompensated loss of core habitat during reconstruction of Bog Creek Road will exacerbate the negative impacts to grizzly bears already struggling in the Blue-Grass BMU, which is currently not meeting the core habitat standards set by the Forest Plan's Access Amendment.

112.     This is particularly problematic because bears that have established patterns of road avoidance for the roads that have received motorized use over the past ten years may continue to avoid these roads even after they are undrivable and barriered. Thus, the roads that have been drivable within the past ten years that will be closed through this Project may not replace core habitat used by grizzly bears for a period of time. As the Fish and Wildlife Service

notes, revegetation may take as long as ten years to get to the point of providing functional core habitat. For this reason, IGBC guidelines recommend that established core habitat be maintained for a minimum of ten years, which is the time it takes for a female grizzly bear to replace herself in the wild.

113. The location of the roads chosen for closure and decommissioning is also problematic for grizzly bears. For example, the Forest Service will close Roads 1322 and 1322A for a total of 5.6 miles. Both of these roads are heavily brushed in and currently impassible. The Forest Service, however, will leave Road 1013 open, which runs almost parallel and adjacent to 1322A for the full length of both 1322 and 1322A. Thus, closing Roads 1322 and 1322A will not add any core area habitat for grizzly bears because their ability to travel west from Continental Mountain will still be impaired and fragmented by Road 1013. Similarly, Roads 1013D and 1013C to the south of Continental Mountain, which are also already heavily brushed in and undrivable, run largely adjacent to Road 1013, which will remain open. Accordingly, pursuant to the Forest Service's decision and the reconstruction of Bog Creek Road, grizzly bears in the Continental Mountain area will be surrounded by roads to the north, south, east, and west, severely inhibiting their movement (see map below). The FEIS does not discuss the impacts of this new enclosure scenario.



114.    The Forest Service also relies upon the Forest Service roads' formal designations to claim that the Bog Creek Project will meet the Forest Plan's Access Amendment standard, while ignoring the on-the-ground realities.  Recent monitoring results demonstrate that actual road use already exceeds formally designated limitations and fails to comply with the Access Amendment standards needed to protect and restore grizzly bears.  Adding more open roads while simply decommissioning impassable roads will result in further Forest Plan violations, causing additional harm to grizzly bears and their habitat.

115.    For example, Table 3.1.3 in the FEIS lays out Open Motorized Route Density current designated use and actual use in the Blue-Grass BMU.   The table reveals that while designated use is 14.9 percent, actual motorized use of roads in the Blue-Grass BMU has ranged from 22.8 percent to 34.7 percent since 2006.  Specifically, it reveals that regular overuse violations have occurred Blue Joe Creek Forest Service Road (Road 2546), and Roads 1101, 636, and 1009 since at least 2006.  Similarly, the FEIS notes that while the Open Motorized Route Density would be 14.9 percent in the Blue-Grass BMU if users adhered to the seasonal

designation limits, the 2017 Open Motorized Route Density was 28 percent because the use limitation of 57 annual trips for seasonally designated roads was regularly exceeded. While Defendants included actual use data in the FEIS, they did not use this data when determining the Project's compliance with the Forest Plan's Access Amendment standards.

116. Defendants do not explain how they will address this known illegal use to protect grizzly bears and ensure compliance with the Forest Plan's Access Amendment standards.

117. Additionally, in the FEIS Defendants acknowledge that two hiking trails—the Upper Priest River Trail (#308) and the American Falls Trail (#28)—are likely to be designated as "high-use" trails due to an increase in recreational use. Once these trails are designated as "high-use" trails, buffer areas surrounding the trails will no longer count toward grizzly core area habitat. Although these new designations are reasonably foreseeable, Defendants do not admit, much less analyze, the extent that these changes will bring the Blue-Grass BMU further out of compliance with the Forest Plan's standard for grizzly core area habitat and how that will negatively impact grizzly bears and their habitat.

### FIRST CAUSE OF ACTION
### Violation of NFMA
### (Failure to Comply with the Forest Plan's Access Amendment Standard)

118. Plaintiffs hereby incorporate all preceding paragraphs.

119. The National Forest Management Act requires the Forest Service to ensure that all site-specific projects in the portion of the Selkirk Recovery Zone that is within the Idaho Panhandle National Forests comply with the Idaho Panhandle National Forests' Forest Plan, including the Forest Plan's Access Amendment standard. *See* 16 U.S.C. § 1604(i) (requiring site-specific projects be consistent with Forest Plan).

120. The Access Amendment standard, as incorporated into the Forest Plan, requires the Blue-Grass BMU meet the following three standards: (1) Open Motorized Route Density of greater than 1 mile per square mile on no more than 33 percent of the BMU (33 percent maximum); (2) Total Motorized Route Density of greater than 2 miles per square mile on no more than 26 percent of the BMU (26 percent maximum), (3) and core area of at least 55 percent

of the BMU (55 percent minimum).

121.    Additionally, the Access Amendment requires the Forest Service to ensure that projects that will reduce core area within individual BMUs shall not reduce the percent core area below the minimum standards for the affected BMU without compensating with in-kind replacement "concurrently or prior to" incurring the losses.

122.    Currently, the Blue-Grass BMU does not meet two of the three standards.  The FEIS reveals that the current Total Motorized Route Density is at 29 percent (3 percent higher than the 26 percent maximum) and existing core area for grizzlies is 48 percent (7 percent lower than the 55 percent maximum).

123.    The evidence in the record contradicts Defendants' claim that the Bog Creek Road Project will comply with the Access Amendment standard.  The Forest Service's own Project timeline indicates that even though the Blue-Grass BMU currently fails to meet core habitat standards, the Project will exacerbate these effects by reconstructing the Bog Creek Road Project without compensating with in-kind replacement concurrently or prior to incurring the losses, as required by the Access Amendment.

124.    The Project's timeline demonstrates that during reconstruction of Bog Creek Road, the Forest Service plans to close FSR 1388, but this closure will not fully compensate with in-kind replacement core habitat, resulting in a 1.2 percent net loss of core habitat.  Moreover, the Forest Service will not decommission already undrivable roads until after the repair of Bog Creek Road.

125.    In the Project's Biological Opinion, the Fish and Wildlife Service acknowledged that the Project will not comply with the Access Amendment's requirement to replace core concurrently or prior to its loss:  "[b]ecause the offset from the closure of FSR 1388 will not increase Core habitat availability to the same or greater extent than Core habitat associated with the Bog Creek Road repair, the proposed project will not fully replace the amount of Core habitat lost 'prior to or concurrent' with the loss," as required by the Access Amendment.  BiOp at 48.

126.    Additionally, the Forest Service cannot demonstrate that the Project will meet Access Amendment standards on the ground because the Forest Service ignored its own

monitoring data showing that actual use exceeds authorized use due to high levels of illegal overuse of roads in the Blue-Grass BMU.

127.    For example, the Forest Service's own data reveals that average Open Motorized Route Density in the Blue-Grass BMU has ranged from 22.8 percent to 34.7 percent since 2006, well above the 14.9 percent Open Motorized Route Density designation and the Forest Service's Access Amendment 33 percent maximum standard.  In alleging compliance, however, Defendants ignore this information and instead rely upon the baseline of 14.9 percent Open Motorized Route Density based solely on the road designations status.  *See* FEIS, Table 2.4.2. Defendants do not explain how they will address the illegal use described to ensure compliance with the Access Amendment standards.

128.    Defendants' decision authorizing the Bog Creek Road Project fails to comply with the Forest Plan's Access Amendment standard, violating NFMA, and thus is arbitrary and capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedures required by law, within the meaning of the APA.  5 U.S.C. § 706(2).

## SECOND CAUSE OF ACTION
### Violation of NEPA
### (Failure to Take a Hard Look at Impacts to Grizzly Bears)

129.    Plaintiffs hereby incorporate all preceding paragraphs.

130.    NEPA requires all federal agencies to take a hard look at the environmental consequences of proposed federal actions, including a description of the baseline conditions and a complete analysis of the potential direct, indirect, and cumulative impacts of proposed actions.

131.    The FEIS fails to take a hard look at how the Bog Creek Project will harm grizzly bears in several ways.  First, Defendants acknowledge that grizzly bears avoid roads and that most human-caused grizzly bear mortality occurs on or near roads.  But Defendants fail to analyze how the reconstruction and opening of Bog Creek Road and the use designation change of four roads year-round and one additional road for a month in the summer will isolate grizzly bears in the Continental Mountain area, closing off any secure movement pathways to the north, south, east, and west.  Once the Bog Creek Road Project is complete, bears in this area will be

completely surrounded by roads. This may prevent grizzly bear movement and further reduce genetic diversity, exacerbating issues already impairing grizzly bear recovery in the Selkirk Recovery Zone.

132. Second, although the evidence reveals that the Bog Creek Road Project will further isolate grizzly bears in the Selkirk Recovery Zone and thwart grizzly bear recovery, Defendants failed to analyze the extent to which the Project will impact recovery under the Endangered Species Act, including the specific recovery goals listed in the 1993 Grizzly Bear Recovery Plan. Impacts from human-caused mortality and female mortality, for example, are two important benchmarks that must be monitored pursuant to the Recovery Plan. However, Defendants fail to estimate the potential for increased human-caused mortality from the Project. Defendants similarly fail to provide any discussion as to how many female bears may be harmed by the Project and how harm to female bears may impact recovery.

133. Third, recent monitoring revealed high levels of unauthorized motorized use throughout the Blue-Grass BMU. Defendants, however, failed to analyze the impacts of this unauthorized use, including how it has already impacted grizzly bears and how it will continue to harm grizzly bears and impair recovery. Instead, Defendants rely on an improper baseline that does not reflect actual motorized use to claim that the Project will improve conditions for grizzly bears.

134. Fourth, Defendants have admitted that the Upper Priest River Trail and the American Falls Trail are on the brink of being designated as "high-use" trails, and thus this change in designation is reasonably foreseeable. Once these trails are designated as "high-use" trails, buffer areas surrounding the trails will be removed from habitat considered grizzly core area habitat, and the Blue-Grass BMU will no longer comply with the Forest Plan's Access Amendment standards for grizzly core area habitat. Defendants have failed to analyze this reasonably foreseeable cumulative impact that will negatively impact grizzly bears and grizzly bear habitat in the Blue-Grass BMU.

135. Finally, Defendants have failed to analyze the cumulative impacts of unauthorized motorized use coupled with the reconstruction and decommissioning work planned in the project

area, the reasonably foreseeable increased recreational use, and how these activities—individually and cumulatively—are currently harming and will continue to harm grizzly bears and impede their recovery throughout the project area and within the broader Selkirk Recovery Zone.

136.    Defendants' decision to authorize the Bog Creek Road Project without taking a hard look at the impacts to grizzly bears as required under NEPA is arbitrary and capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedures required by law, within the meaning of the APA.  5 U.S.C. § 706(2).

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.   Declare that the Forest Service violated NFMA by authorizing the Bog Creek Road Project without demonstrating compliance with the Access Amendment's standards and the Forest Plan;

B.   Declare that the Forest Service and CBP violated NEPA by authorizing the Bog Creek Road Project without taking a hard look at the impacts to grizzly bears;

C.   Vacate the decision approving the Project;

D.    Enjoin implementation of all aspects of the Project unless and until Defendants demonstrate compliance with federal law;

E.   Award Plaintiffs their reasonable attorneys' fees, costs, and litigation expenses under the Equal Access to Justice Act, and/or any other applicable provision of law; and

F.    Grant such further and additional relief as the Court deems just and proper in order to remedy the violations of law alleged herein and to protect the interests of Plaintiffs, the public, and the affected wildlife.

Dated:  March 10, 2020                            Respectfully submitted,

/s/ Andrea Santarsiere
Andrea Santarsiere (ISB #8818)
Center for Biological Diversity
P.O. Box 469
Victor, ID  83455
Tel:  (303) 854-7748
asantarsiere@biologicaldiversity.org


Collette Adkins (MN #035059X)*
Center for Biological Diversity
P.O. Box 595
Circle Pines, MN  55014-0595
Tel:  (651) 955-3821
cadkins@biologicaldiversity.org

*Seeking admission *pro hac vice*

*Attorneys for Plaintiffs*