UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY; WILDEARTH GUARDIANS; IDAHO CONSERVATION LEAGUE; THE LANDS COUNCIL; and SELKIRK CONSERVATION ALLIANCE, | Case No. 2:20-cv-00128-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

Plaintiff,

v.

U.S. FOREST SERVICE; VICKI CHRISTIANSEN, in her official capacity as Chief of the U.S. Forest Service; JEANNE HIGGINS, in her official capacity as Forest Supervisor for the Idaho Panhandle National Forests; U.S. CUSTOMS AND BORDER PROTECTION; ALEJANDRO MAYORKAS, in his official capacity as Secretary of the U.S. Department of Homeland Security; and TROY A. MILLER, in his official capacity as Senior Official Performing the Duties of the Commissioner for U.S. Customs and Border Protection,

Defendants.

## INTRODUCTION

Before the Court are the Parties' cross motions for summary judgment. Dkt. 20, 23. The Court held a hearing on the motions on March 4, 2021. For the reasons that follow, the Court will grant Defendants' motion and deny Plaintiffs' motion.

## BACKGROUND

Plaintiffs allege that the Defendants' approval of the Bog Creek Road Project violates the National Forest Management Act (NFMA) and the National Environmental Policy Act (NEPA).

The Bog Creek Road Project is located in the Idaho Panhandle National Forest in northern Idaho. AR 005115. The Project will reopen the Bog Creek Road (Forest Road #1013) for administrative use to provide an east-west route for U.S. Customs and Border Protection (CBP) to use in monitoring the border. AR 004058; AR 005119. It will change use designations on over 20 miles of national forest roads from seasonally restricted to administratively open or seasonally open. AR 005119. Finally, it will formally close 26 miles of seasonally restricted roads through decommissioning and long-term storage. *Id.*; AR 005158-59.

The Bog Creek Road is currently designated as a seasonally restricted road. The Bog Creek Road was gated in the 1980s to create bear security habitat and is now largely unpassable due to a culvert failure and vegetation growth. AR 004058.

The monitoring reports indicate that the road was accessed by CBP and Forest Service staff using ATVs in 2011, 2012, and 2014. AR 029931, 029945, 029958. CBP conducted vegetation-clearing activities on the eastern portion of the road in 2016 due to potential cross-border violations. AR 004058.

The Project is located almost entirely within the Blue-Grass Bear Management Unit (BMU) of the Selkirk Grizzly Bear Recovery Zone (SRZ).[1] AR 004058; AR 030044. The Blue-Grass BMU provides year-round high quality bear habitat and is considered a "gateway" BMU because it is at the center at the SRZ and allows genetic connectivity between bear populations in the U.S. and Canada. AR 030054. Key risk factors for grizzly bear recovery are a lack of security habitat, human caused mortality, and genetic isolation. AR 030047. In 2011 the Forest Service adopted an Access Amendment to the forest plans within the SRZ and Cabinet-Yaak Grizzly Bear Recovery Zone to improve grizzly bear recovery. AR 033576.

The Access Amendment requires each bear management unit to meet certain standards for 1) open motorized route density, 2) total motorized route density, and

_____

[1] The SRZ is unique among the five recovery zones because half of it is located in Canada. This was necessary because there is insufficient habitat within the U.S. portion to support a viable grizzly bear population. AR 030047.

3) core area. AR 033586; AR 035392-93. Open motorized route density (OMRD) is calculated by determining the linear miles of open roads, other roads not meeting all restricted or obliterated criteria, and open motorized trails, per square mile of BMU.[2] AR 033585. Total motorized route density (TMRD) is calculated by determining the linear miles of open roads, restricted roads, roads not meeting all reclaimed criteria, and open motorized trails, per square mile of BMU. *Id.* Core area is "[a]n area of secure habitat within a BMU that contains no motorized travel routes or high use nonmotorized trails during the non-denning season … and is more than 0.3 miles (500 meters) from a drivable road." *Id.* "Core areas do not include any gated roads but may contain roads that are impassible due to vegetation or constructed barriers." *Id.* Where a BMU does not meet OMRD, TMRD, or core area standards – as established by the Access Amendment – any project affecting the relevant standard must result in post-project improvement of the standard. *Id.*

The Access Amendment adopted the following standards for the Blue-Grass

---

[2] An open road is "a road without restriction on motorized vehicle use." AR 020145. A restricted road is "a road on which motorized vehicle use is restricted seasonally or yearlong" and requires effective physical obstruction. *Id.* A reclaimed or obliterated road is "a route which is managed with the long-term intent for no motorized use, and has been treated in such manner so as to no longer function as a road." *Id.* Trails are access routes that are not drivable by a passenger car or pickup but may be used by 4-wheelers, 4-wheel drive vehicles, or trail bikes. *Id.*

BMU: 1) OMRD of greater than 1 mile per square mile on no more than 33 percent of the BMU; 2) TMRD of greater than 2 miles per square mile on no more than 26 percent of the BMU; and 3) Grizzly bear core area habitat comprising at least 55 percent of the BMU. AR 005117; AR 033586. When the Access Amendment was adopted the Blue-Grass BMU had an actual TMRD of 28 percent and core area of 50 percent,[3] which did not meet the Access Amendment standards. AR 033586. The OMRD based on the administrative designation of roads within the Blue-Grass BMU is 14.9 percent, but the OMRD based on actual use has ranged from 22.8 percent to 34.7 percent between 2006 and 2018, with an average actual OMRD of 29.7 percent. AR 004126; *See also* AR 029877-030019 (2006-2018 Monitoring Reports).

Although the Bog Creek Road has been mostly impassible since the mid-2000s and has been acting as security habitat, the Forest Service has never included it in the core area calculation. AR 004074; *See also* AR 029877-030019 (2006-2018 Monitoring Reports). Thus, reopening of the Bog Creek Road will not reduce the core area of the Blue-Grass BMU. AR 005125. The closure of 26 miles of seasonally restricted roads, and other project activities will increase the core

---

[3] In 2015 the Forest Service identified a previously unmapped roads that reduced the core area of the Blue-Grass BMU from 50 percent to 48 percent. AR 029984.

area within the Blue-Grass BMU to 55.4 percent, which meets the access amendment standard. *Id.* Like the Bog Creek Road, many of the roads slated for closure have been impassible, but have never been designated closed, so they have not counted toward core area. AR 004074; AR 005159. The Project will reduce the TMRD to 19.3 percent and increase designated OMRD to 31.3 percent, bringing the Blue-Grass BMU into compliance with the access amendments. AR 005126.

The Biological Assessment and Biological Opinion used "functional core" habitat to account for roads that were undriveable for more than 10 years and provide grizzly bear security habitat, even though they had never been formally closed or counted in the core area. AR 030059-60; AR 043563. Functional core habitat was used to better account on-the-ground conditions and impacts of the project to grizzly bears. AR 030059. The BA calculated that the Blue-Grass BMU has 30,442 acres of functional core habitat, which is still less than the 55 percent Core Area standard.[4] AR 30060. Once the Project is completed there will be a net increase of 1,318 acres of functional core habitat.[5] AR 030087-88.

_____

[4] The Blue-Grass BMU is 57,329 acres, thus the 30,442 acres of functional core habitat is only 53 percent of the BMU. AR 004130; AR 30060.

[5] There will be a net loss of functional core habitat in the Bog Creek Focus Area, but a net increase in the Grass Creek Focus area. Because both focus areas are located within the Blue-
(Continued)

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. In an administrative record review case, a court may direct summary judgment based upon whether the evidence in the administrative record permitted the agency to make the challenged decision. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir.2012) (en banc).

An agency's compliance with NFMA and NEPA is reviewed under the Administrative Procedures Act (APA). *All. for the Wild Rockies v. Bradford*, 856 F.3d 1238, 1242 (9th Cir. 2017). Under the APA, the reviewing court must set aside the agency's decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, ... in excess of statutory jurisdiction, ... [or] without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (C), (D). Such a review is narrow and a court may not substitute its judgment for that of the agency. *Oregon Nat. Desert Ass'n v. United States Forest Serv.*, 957 F.3d 1024, 1033 (9th Cir. 2020). Neither should a court just "rubber-stamp" administrative decisions. *Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife Servs.*, 273 F.3d

---

Grass BMU there will be an overall increase in functional core habitat after the Project is complete and the road closures are effective. AR 30091, 30093.

1229, 1236 (9th Cir. 2001).

A decision is arbitrary and capricious if the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *O'Keeffe's, Inc. v. U.S. Consumer Product Safety Comm'n*, 92 F.3d 940, 942 (9th Cir.1996). An agency action is also arbitrary and capricious if the agency fails to articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. *Id.* Finally, an agency must clearly set forth the grounds on which it acted. *See Atchison T. & S.F. Ry. v. Wichita Bd. of Trade*, 412 U.S. 800, 807 (1973).

## ANALYSIS

### A.    National Forest Management Act

NFMA requires that all site-specific projects within a National Forest be consistent with the relevant forest plan. 16 U.S.C. § 1604(i). Here the Idaho Panhandle National Forest Plan was approved in 2015 and adopted the grizzly bear Access Amendment as a standard that is binding on future site-specific decisions. AR 035246, 035392-96; *see Oregon Nat. Desert Ass'n v. United States Forest*

*Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020). Although the Forest Service must strictly comply with the forest plan's standards, the Ninth Circuit has held that courts are to give the Forest Service latitude in "ensuring the consistency of its actions with Forest Plans." *Id*. ("We will conclude that the Forest Service acts arbitrarily and capriciously only when the record plainly demonstrates that the Forest Service made a clear error in judgment in concluding that a project meets the requirements of the NFMA and relevant Forest Plan." (quoting *The Lands Council v. McNair*, 537 F.3d 981, 994 (9th Cir. 2008) (en banc)).

At the hearing, Plaintiffs argued that the Supreme Court's opinion in *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019), effectively changed the deference owed to the Forest Service's interpretation of its forest plan. Plaintiffs argue that forest plans are accorded the same amount of deference as agency regulations and thus *Kisor's* narrowing of *Auer* deference also reduced the amount of deference owed to the Agency's interpretation of its forest plan. *See* Dkt. 29 at 6.

In *Kisor* the Supreme Court explained that "the possibility of deference can arise only if a regulation is genuinely ambiguous." 139 S.Ct. at 2414. To the extent that genuine ambiguity exists an agency's reading must still be "reasonable." *Id*. at 2416.

The only Ninth Circuit opinion to address *Kisor* in the context of a challenge

to the Forest Service's interpretation of its forest plan is *Friends of Rapid River v.*

*Probert*, 816 F. App'x 59, 63 (9th Cir. 2020). There the Ninth Circuit held that

"[t]he relevant Forest Plan requirements either support the Forest Service's view or

are at least "genuinely ambiguous," and the Forest Service's interpretation of them

is reasonable and contextually appropriate." *Id*. (citing *Kisor*, 139 S.Ct. at 2414-

2418). The Ninth Circuit also decided *Oregon Natural Desert Association*, 957

F.3d at 1035, after *Kisor*, but did not mention *Kisor* in its opinion. Instead, the

Ninth Circuit reiterated that "the Forest Service's interpretation and

implementation of its own Forest Plan is entitled to substantial deference." *Id.*

(quoting *Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1056 (9th Cir.

2012)).

 Here, whether the Forest Service's interpretation of the Access Amendment

is accorded substantial deference or "*Kisor* deference," the Court finds that the

Forest Service did not violate the National Forest Management Act.

 Plaintiffs argue that the Forest Service's interpretation of "core area" is

counter to the Access Amendment and, as such, the Project reduces core area

without in-kind replacement concurrently or prior to incurring the losses. Dkt. 29

at 5-6. The Government's position is that core areas must be established through a

formal administrative decision and may not be created simply because an area is

serving is security habitat. Dkt. 23-2 at 14-15.

The Access Amendment sets the following "[p]arameters for establishing

and managing core habitat in all BMUs:"

1. In accordance with IGBC (1998) and Selkirk/Cabinet-Yaak
   Ecosystem Subcommittee (1998) direction, core areas shall be
   established for the purpose of providing secure habitat for grizzly
   bears.

   a) Core areas include high quality habitat within a BMU that
      contains no motorized travel routes or high use trails.

   b) Core areas do not include any gated or restricted roads but may
      contain roads that are impassable due to re-growth of vegetation,
      effective barriers other than gates, or placement of logging or
      forest debris so as to no longer function as a motorized route.

   c) When possible, core areas would be delineated by identifying
      and aggregating the full range of seasonal habitats that are
      available in the BMU.

   …

   e) Once route closures to create core areas are established and
      effective, these core areas should remain in place for at least 10
      years. Therefore, except for emergencies or other unforeseen
      circumstances requiring independent section 7 consultation,
      newly created core area shall not be entered for at least 10 years
      after creation.

   f) Roads that are closed, decommissioned, or barriered in the future
      to create core area would be put in a condition such that a need
      for motorized access for maintenance is not anticipated for at
      least 10 years. Until such closed roads are placed in the above-
      described condition, they would not be considered as contributing
      to core area.

2. Entering core area blocks for road decommissioning or stabilization
   activities:

   a) Without further section 7 consultation on grizzly bears, the

Forest Service may affect underlying core area (i.e., any core habitat that is affected by the subject road and its buffer) within a BMU once per 10-year time frame, and not to exceed one bear year for the sole purpose of completing road decommissioning/stabilization activities on existing closed or barriered roads in core area habitat.

b) Subsequent needs to re-enter individual core areas within a BMU more frequently than once per decade for the purposes of road decommissioning shall be handled on a case-by-case basis through standard section 7 consultation procedures. The effects of additional entries would be analyzed pursuant to such project level consultation. Pending the outcome of each analysis, additional measures to minimize potential effects to grizzly bears may be required.

3. Routine forest management may be proposed in a core area block after 10-years of core area benefit. However, BMUs must remain at or above the core standard. Therefore, potential losses to existing core must be compensated with in-kind replacement concurrently or prior to incurring the losses. Such in-kind replacement of core would be established within the affected BMU in accordance with the direction in Part I.B.1., above. … Following management, core areas must subsequently be managed undisturbed for 10 years.

AR 035393-94.

Plaintiffs focus narrowly on section 1.b., above, to argue that the Bog Creek Road corridor qualifies as "core area" because it is overgrown and impassible. The Forest Service argued that because it was gated it could not qualify under section 1.b. Section 1.b. is ambiguous whether a road that is gated *and* impassible due to vegetation growth may be considered core area. However, the remaining section of the Access Amendment are not ambiguous and, as the Forest Service argues,

requires core area to be "established." While the Access Amendment never explicitly states that core area must be established through a formal designation, it certainly envisions as much. Section 1 directs that "core areas shall be established…." Section 1.e provides that route closures creating core areas must be established and effective and shall remain in place for 10 years, thus "newly created core area shall not be entered for at least 10 years after *creation.*" (emphasis added). Section 1.f. provides that roads must be closed, decommissioned, or barriered such that entry is not required for 10 years before they can be considered as contributing to core area.

Taken as a whole, the language of the Access Amendment requires the Agency to affirmatively create and establish core area. While not stated explicitly, this requires an affirmative decision or action by the Agency.

Even if the Access Amendment allowed core area to naturally accrue, the Forest Service reasonably did not include the Bog Creek Road in its core area calculation. The Forest Service and CBP have both used ATVs to access the Bog Creek Road within the past 10 years, and CBP conducted brush clearing activity on the eastern portion of the road in 2016. This use demonstrates that the Bog Creek Road was not "closed, decommissioned, or barriered" such that no motorized access is needed for 10 years. AR 035393. The 2011 monitoring report modeled

the Bog Creek Road as "open" due to CBP use. AR 029945. Further, the

monitoring reports demonstrate that, since 2006, the Forest Service has never

considered the Bog Creek Road as contributing to core area within the Blue-Grass

BMU. AR 029877-030019 (2006-2018 Monitoring Reports). This shows that the

Bog Creek Road was still acting as a "motorized travel route" and therefore was

properly not considered as part of core area.

Even if the Access Amendment is ambiguous, which it is not, the Forest

Service's interpretation regarding core area and whether the Bog Creek Road

qualifies as such, is entirely reasonable. The Court finds that the Bog Creek Road

does not meet the Access Amendment's criteria as core area, and the Forest

Service appropriately refused to consider it as part of the core area within the Blue-

Grass BMU.[6]

It is clear from the record that the Forest Service has been conservative in its

_____

[6] To the extent Plaintiffs rely on the BA's discussion of "functional core" habitat, that reliance is misplaced. CBPs brush clearing activities on the Bog Creek Road demonstrate why core area and functional core habitat are not the same. Because the Bog Creek Road was seasonally restricted, CBP could continue to access and clear the road without a separate administrative decision. While the Bog Creek Road corridor may have naturally accrued to security habitat, CBP could just as easily remove it from security habitat. This directly conflicts with the language and intent of the Access Amendment. Further, the BA recognizes that even considering the entire functional core habitat, the Blue-Grass BMU is not meeting the core area standard as required by the Access Amendment. AR 30060. Only after the project is completed, and human activity has subsided on closed roads, would there be enough functional core habitat to meet the access amendment standard. AR 030087-88.

estimate of core area within the Blue-Grass BMU, a decision that ultimately allowed this project to proceed but in the long run is more protective of grizzly bears.

Plaintiffs next argue that the Forest Service failed to demonstrate the Project will meet the Access Amendment standards because it has failed to account for "high levels of illegal overuse" of restricted roads within the Blue-Grass BMU. Dkt. 21 at 23-24. Plaintiffs' claim is without merit. As an initial matter, the monitoring reports disclose very few instances of "illegal" motorized road use within the Blue-Grass BMU. *See* AR 043559 (BiOp discussing illegal access in SRZ); AR 029945 (2011 monitoring report discussing ATV driving around gate).

The Access Amendment allows seasonally restricted roads to have up to 57 trips per year before being considered as open for purposes of calculating OMRD. AR 035394-95. The Forest Service repeatedly disclosed and discussed the seasonally restricted roads that received more than 57 trips in a season. *See* AR 004072, 004126. The Access Amendment does not prohibit exceeding trip-limits, but instead require the Forest Service to count toward OMRD roads which do exceed trip-limits. AR 035394-95.

Plaintiffs focus on the OMRD of 14.9 percent listed in table 2.2.1. of the Final EIS. AR 004072. Table 2.2.1. is based on the designated road status under

the Access Amendment, not actual use. *Id*. Table 3.1.3. discloses the average

actual use since 2006 – 29.7 percent (ranging from 22.8 percent to 34.7 percent).

AR 004126. The Final EIS repeatedly refers readers to the actual OMRD

calculation, not the calculation in table 2.2.1.

The Project changes almost 22 miles of roads from seasonally restricted to

administrative open. AR 005119. Essentially the Project changes the designation of

roads to better reflect reality on the ground. This was fully disclosed in the Final

EIS and is consistent with the Forest Plan.

### B.    National Environmental Policy Act

NEPA requires that agencies prepare an EIS for any proposed agency action

"significantly affecting the quality of the human environment." 42 U.S.C. §

4332(C). NEPA is a pragmatic device that "'does not mandate particular results,'

but 'simply provides the necessary process' to ensure that federal agencies take a

'hard look' at the environmental consequences of their actions." *Muckleshoot*

*Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 814 (9th Cir.1999) (quoting

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)). Judicial

review of agency decision-making under NEPA is limited to the question of

whether the agency took a 'hard look' at the proposed action as required by a strict

reading of NEPA's procedural requirements. *Bering Strait Citizens for Responsible*

*Dev. v. U.S. Army Corps of Eng'rs*, 524 F.3d 938, 947 (9th Cir.2008). Courts look to the evidence the agency provided to support its conclusions, along with materials in the record to determine if the agency took the requisite "hard look." *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1124 (9th Cir. 2012).

Plaintiffs raise four distinct claims regarding the Agency's NEPA analysis. First the Plaintiffs argue that the Forest Service failed to take a hard look at how the project – specifically reopening of the Bog Creek Road – will prevent bear movement and limit genetic diversity.

The bear population within the SRZ has the lowest genetic diversity of the ESA-listed grizzly bear populations. AR 030051. Thus, connectivity between bears in the U.S. and Canada is considered critical for bear recovery. *Id.* The Final EIS recognizes that the Blue-Grass BMU is an important bear movement corridor between other BMUs in the U.S. and the Canadian portion of the SRZ. AR 004169. It then discusses, in some detail, the effect reopening the Bog Creek Road will have on grizzly bear movement between the U.S. and Canada. *Id.* There is a network of open roads just north of the border that, combined with open motorized routes in the U.S., likely act as a semipermeable barrier to grizzly bear movement. AR 004143. The Forest Service recognizes that reopening the Bog Creek Road would add to this semipermeable barrier and may reduce genetic flow between the

U.S. and Canada. AR 004169, 004188; *see also* AR 004102-04 (table summarizing impacts of each proposed action to grizzly bears). While the Project may reduce connectivity with Canada, it will also improve connectivity to the Trapper Creek burn area and other BMUs south of the Blue-Grass BMU, which will be beneficial for grizzly bears. AR 004099, 004188.

The BiOp supports the analysis of the Final EIS, stating that while the reopened Bog Creek Road may reduce movement, bears will still cross the road and move between the U.S. and Canada.[7] AR 043605. This supports the Forest Service's discussion within the Final EIS, and other NEPA documents, regarding the effects of reopening the Bog Creek Road on genetic connectivity. The Court concludes that the Forest Service took a hard look at bear linkages and genetic connectivity.

Second, Plaintiffs contend that the Agency failed to analyze the extent to which the Project will impact bear recovery under the ESA, including how the Project may negatively impact achieving specific recovery goals listed in the Grizzly Bear Recovery Plan. This contention is without merit.

---

[7] The BiOp was issued after the Final EIS and cannot relieve the Agency of its duty to take a hard look within the EIS. But, the analysis in the BiOp is useful in determining whether the agency considered the relevant factors and made a reasoned decision.

The U.S. Fish and Wildlife Service identified motorized access management, habitat security, human caused mortality, and genetic fragmentation as key risks to grizzly bear recovery in the SRZ. AR 030046-47. The Final EIS quantifies project impacts to grizzly bears based on these factors. Further, the Access Amendment was explicitly adopted to serve the goals of the grizzly bear recovery plan. AR 033590. The Access Amendment uses OMRD, TMRD, and Core Area as surrogates for grizzly bear recovery risk factors. AR 033590-94; AR 020143-47.

The Final EIS conducted an in-depth analysis of the effects of the project OMRD, TMRD, and Core Area. It went further and specifically analyzed human activity, fragmentation and linkages, and impacts to habitat by type. AR 004169-72, 004188-91. These are the risk factors identified as limiting grizzly bear recovery in the SRZ and the Forest Service took a hard look at them.

Third, the Plaintiffs argue that the Forest Service failed to take a hard look at illegal motorized use in the Blue-Grass BMU. As discussed above there is very little "illegal" motorized use in the Blue-Grass BMU or SRZ. AR 043559; AR 029945. Plaintiffs rely on notes from a 2013 meeting where one participant suggested the Agencies would need to "go above and beyond" to stop illegal use. *See* SUP AR 17.

The Final EIS and Record of Decision discuss the measures that will be used to fully close roads designated for closure. AR 004077; AR 005158. Many of the seasonally restricted road segments in the Blue-Grass BMU are already gated and there is no indication that that will change. Further, the Forest Service regularly monitors restricted roads within the BMU as required by the Access Amendment. *See* AR 004126; AR 035396. Finally, gates will be installed at both ends of the Bog Creek Road, which are designed to minimize potential destruction, dismantling, or breaching. AR 004076, 004447. These gates will be regularly monitored and would be posted with signs stating: "Public Motorized Entry Prohibited – This Road is Under Surveillance – Violators will be Prosecuted." AR 004076.

The Forest Service took a hard look at truly illegal motorized use within the BMU. As the BiOp noted, enhanced monitoring following the project will actually reduce the potential for illegal use. AR 043642.

Plaintiffs real gripe is with the annual trip exceedances on restricted roads. But as discussed above, the Forest Service properly accounted for these trips in the OMRD calculation. The Forest Service in no way tried to disguise or hide the exceedances, instead it fully discussed them in the EIS and proposed to change the status of roads that commonly exceed trip limits from restricted to administratively

open. This will bring the designated road status into alignment with actual road use while meeting the Access Amendment OMRD standard. The Final EIS took a hard look at road use in the Blue-Grass BMU and the Forest Service considered ways to accommodate both administrative needs with grizzly bear needs.

Finally, Plaintiffs argue that the Forest Service failed to take a hard look at the Projects impacts to two hiking trails on the west side of the Blue-Grass BMU. If the trails were to be designated "high use" (over 20 parties per week) they would no longer contribute to core area within the Blue-Grass BMU. AR 035393.

The Final EIS discusses both trails and states they are being monitored to determine whether they should be considered high use. AR 004146, 004343-44. Monitoring documented that the trials are receiving an average of up to 16 parties per week during the summer season. AR 004146. In the short term the Final EIS states that the trailhead for the Continental Creek trail may be more difficult to access due to work on the Bog Creek Road. AR 004359. The Final EIS recognizes that if a trail becomes high use, it will reduce core area within the BMU. But, it also indicates that the core area reduction will be dependent on which trail segment(s) are designated as high-use and which alternative is chosen to implement the core area reduction. AR 004521.

Plaintiffs rely on some discussion in the BiOp and meeting notes to support

their argument that the Forest Service failed to consider impacts the Project will have to the trails. The BiOp discusses non-motorized recreation generally and indicates that the Bog Creek Road repair will likely increase the amount of recreational use in the area or redistribute existing users. But the BiOp does not tie the increase in recreation in the area to increased use on the trails. AR 043594. The meeting notes indicate that there is interest from mountain bikers and other recreationalists in using the repaired Bog Creek Road, which may lead to increased trail use. SUP AR 000014; SUP AR 000042.

The Government is not required to analyze potential impacts where there is not enough information available to permit meaningful consideration. *Env't Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1014 (9th Cir. 2006). The road leading to both trails is already open to the public. AR 004339. While the Bog Creek Road may attract more non-motorized recreationalists in the long term, it will not provide an additional route to access the trails. And, in the short term the project may actually reduce trail access opportunities. Any actual increase in use of the trails is speculative. The Forest Service is monitoring trail use, even though it is under no obligation to do so. AR 043641. Because the impacts to non-motorized recreation are speculative the Forest Service's consideration of the Project's effects on trail use is not arbitrary and capricious.

## ORDER

**IT IS ORDERED that:**

1.   Plaintiff's Motion for Summary Judgment (Dkt. 20) is **DENIED**.

2.   Defendant's Cross-Motion for Summary Judgment (Dkt. 23) is

     **GRANTED**.

DATED: June 4, 2021

B. Lynn Winmill
U.S. District Court Judge